[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1206 
Shawn Ramanauskas ("the child"), age 10, died after being electrocuted while attempting to purchase a snack from an ungrounded electric vending machine owned and maintained by Lance, Inc., a distributor of vending machines. The child's parents, Michael and Tela Ramanauskas ("the parents"), sued Lance, Inc., and several other defendants pursuant to Ala. Code 1975, § 6-5-391, which provides a cause of action for the wrongful-death of a minor. The other defendants were Williams Motel, Inc., and Holiday Inns, Inc. (hereinafter collectively referred to as "the motel"); the owners of the Holiday Inn of Clanton, Alabama, on whose premises the Lance, Inc., vending machine that electrocuted the child was located; the Montgomery Coca-Cola Bottling Company, Ltd. ("Montgomery Coca-Cola"), the owner of the soft drink vending machine that was adjacent to and in physical contact with the Lance vending machine on the motel's premises; Dixie-Narco, Inc., and U-Select-It, Corp., the manufacturers of the Coca-Cola and the Lance vending machines; and Sandra Gore, the manager of the Holiday Inn of Clanton, as well as several fictitiously named parties. The parents' theories of recovery from Dixie-Narco, Inc., and U-Select-It, Inc., were based on negligence, wantonness, and product liability. Their theories of recovery from the motel, Montgomery Coca-Cola, and Lance, Inc., were based only on negligence and wantonness.
After extensive discovery, the trial court entered a summary judgment in favor of all of the defendants except Lance, the motel, and Montgomery Coca-Cola. The motel and Montgomery Coca-Cola then entered into pro tanto settlements with the parents. Pursuant to their settlements, Montgomery Coca-Cola agreed to pay $3 million and the motel agreed to pay $7 million. The parents proceeded to trial against Lance alone, claiming that Lance had negligently and/or wantonly caused the child's death. The jury returned a verdict in favor of the parents and against Lance in the amount of $13 million. The trial court denied Lance's posttrial motion for a new trial, for a judgment as a matter of law ("JML"), for a remittitur, or to alter, amend, or vacate the judgment. Lance appeals.
Lance argues that the trial court erred in denying its motion for a JML or for a new trial because, it argues, the parents failed to establish that Lance had a duty to police the electrical circuits at the motel. Lance also contends that the trial court erred in denying its motion for a JML or for a new trial because, it says, the parents failed to present substantial evidence as to each element of their negligence claim and their wantonness claim.
Lance also argues that the jury was confused about how to treat the pro tanto settlements in arriving at the amount of its verdict. Lance also maintains that the jury's verdict was not unanimous. Lance contends that the confusion of the jury and the lack of a unanimous verdict were prejudicial and deprived it of due process and violated its right to a trial by jury. Lance also argues that the circumstances giving rise to the confusion judicially estop the parents from asserting a right to any more than $3 million of the $13 million awarded by the jury.
Lance further maintains that plaintiffs' arguments improperly invoked sympathy and injected Lance's financial situation and the fact that it had insurance coverage into the trial. Those improper arguments, it says, require a new trial or a remittitur of the damages. Lance also asserts that the trial court erred in not awarding a new trial or a remittitur because, it argues, the parents did not present evidence that *Page 1208 
Lance's conduct was so reprehensible as to support the jury's verdict; because the damages award, it says, is disproportionate to awards in similar cases; and because, it says, the damages award is tainted by the improper references of the parents' counsel to Lance's misconduct in other states. Finally, Lance argues that the verdict is constitutionally unacceptable because, it says, the child's electrocution was unforeseeable, and the penalty imposed was excessive.
 I. The Sufficiency of the Evidence as to Lance's Allegedly Negligent and Wanton Conduct
Lance first contends that the trial court erred in denying its postverdict motion for a JML because, it says, the parents did not produce evidence from which the jury could reasonably conclude that Lance had been either negligent or wanton or that if it had been, that its negligence or wantonness had caused the child's death. When reviewing a ruling on a motion for a JML, this Court applies the same standard applied by the trial court in granting or denying the JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented substantial evidence to allow the factual issue to be submitted to the jury for resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). See, also, § 12-21-12, Ala. Code 1975; and West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a ruling on a motion for JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw. Carter, 598 So.2d at 1353. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126
(Ala. 1992).
 A. Negligence
Lance argues that the parents did not produce substantial evidence from which the jury could find that Lance had been negligent or that its negligence caused the child's death. To support their negligence claim, the parents had to produce substantial evidence that Lance owed a duty of care to the child or to a class of persons that included the child, that Lance breached that duty of care, and that this breach proximately caused the child's death. See Graveman v. Wind Drift Owners' Ass'n, Inc.,607 So.2d 199 (Ala. 1992). Lance contends that the parents did not produce any evidence that it owed a duty of care to the child or to other persons using its vending machines, and that the parents did not produce substantial evidence that Lance's conduct was the proximate cause of the child's death.
A duty of care arises when it is foreseeable that harm may result if care is not exercised. See Bush v. Alabama Power Co.,457 So.2d 350 (Ala. 1984). Lance maintains that it was under no duty to police the condition of the circuitry providing electrical current to its vending machines because, it says, it was not foreseeable that someone might be electrocuted while using their machines. Lance says that no incident related to an electrical problem associated with its vending machines was reported before the child's death.[1]
The parents direct our attention to Harris v. Board of Water Sewer Comm'rs of City of Mobile, 294 Ala. 606, 320 So.2d 624,630 (1975), where this Court, citing Havard v. Palmer Baker Engineers, Inc., 293 Ala. 301, 302 So.2d 228 (1974), held that "where one party to a contract assumes a duty to another party to that *Page 1209 
contract, and it is foreseeable that injury to a third party — not a party to the contract — may occur upon a breach of that duty, the promisor owes a duty to all those within the foreseeable area of risk." The foreseeability of injury to others upon the negligent performance of a contract is the touchstone of tort liability to a third party. See Berkel Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496 (Ala. 1984). The parents maintain that they produced substantial evidence that Lance and the motel had entered into a contract, and that pursuant to that contract Lance had assumed a duty to keep its vending machine safe. The parents say that they submitted substantial evidence that it was foreseeable that injury could occur if the vending machine was not properly installed and maintained, and that, therefore, the question of foreseeability was properly submitted to the jury. We agree.
The evidence showed that although at the time of the accident vending machines owned by both Lance and Montgomery Coca-Cola were plugged into a receptacle that accepted a three-pronged plug typically used when a circuit is grounded, the receptacle had been improperly installed by the motel's handyman five years earlier; not only was the receptacle not grounded, it was wired with reversed polarity. The evidence further indicated that the motel did not take corrective measures after a series of specific complaints of electric shocks involving the machines that were plugged into that receptacle, beginning just three days before the child's death. The evidence also showed that Montgomery Coca-Cola was aware of an incident in which a user had been shocked at another vending machine located at the same motel four years before the child's death, that the soft drink machine was touching the Lance vending machine at the time of the death, that the soft drink machine was filthy, that the grounding prong had been removed from its plug, and that Montgomery Coca-Cola knew that its machines at many locations shocked customers at least once a year.
The evidence reflected that, pursuant to its contract with the motel, Lance agreed to "maintain and keep [the vending machine] in good working order," for a fee of approximately $300 per year. The Lance corporate representative who testified on the issue of safety testified that this contractual obligation imposed a duty to keep the machine in a safe condition. In addition, Lance's safety manual contains procedures for installing the Lance vending machine. That manual specifically requires that the installer verify that the electrical receptacle into which the machine is plugged is properly grounded. The section entitled "Installation Instructions" in the safety manual includes the following statement: "To insure safe operation of an electrically equipped [vending machine], the [vending machine] must be grounded." The manual also states the proper procedure for ensuring that the receptacle into which the vending machine is plugged is properly grounded. Therefore, the jury could have found that Lance had entered into a contract with the motel, and that pursuant to that contract Lance had assumed a duty to keep its vending machine located on the motel's property safe. Thus, the only question regarding Lance's argument that it owed no duty of care is whether it was foreseeable that injury to a third party — not a party to the contract — could occur. See Berkel Co. Contractors, supra.
Lance maintains that it did not have actual knowledge of the condition, and that, therefore, it could not foresee that injury to a third party could occur. However, the test is not what Lance in fact knew, but whether it was reasonably foreseeable that a failure to maintain the vending machine in a safe condition could cause injury to a third party. See Cherokee Elec. Co-op. v. Cochran,706 So.2d 1188, 1192 (Ala. 1997). Viewing the evidence in the light most favorable to the parents, as we must, we hold that the evidence was *Page 1210 
sufficient to submit the question of foreseeability to the jury.
The evidence before the jury included testimony from a vice president of sales administration of Lance, Inc., that Lance was aware, as early as 1979, of the significance of the shocking hazard of its vending machines. This awareness prompted Lance to reduce the voltage in certain parts of its vending machines. The vice president testified that in 1979, Lance developed a 24-volt "system" for its vending machines. He stated that this "system" reduced all voltage in its vending machines, except for the voltage of the overhead lights, from 110 volts to 24 volts.
The parents also submitted expert testimony describing the concept of grounding and stating that the possibility of injuries from ungrounded equipment as "well known." The parents' expert testified that an abundance of literature on the necessity of grounding electrical equipment exists and that anyone in the business of installing electrical equipment would know to ensure that its equipment is properly grounded. The same expert testified that it would be "unsafe" for Lance to assume that electric receptacles in older buildings such as the Clanton Holiday Inn were properly grounded and that Lance should have known to test the receptacle to determine whether it was properly grounded. The parents' expert also testified that Lance could have used a $5 tester to determine whether the outlet was grounded. Lance's employees, however, stated that they never used such a tester, and its routemen were not equipped with or trained to use such a tester. Our analysis of the foreseeability issue is also informed by the content of Lance's safety manual, which clearly required the installer to verify that the machine is grounded.
Lance, however, seeks to avoid the effects of its own safety manual by relying upon Martin v. Goodies Distribution,695 So.2d 1175 (Ala. 1997), in which this Court held that the owner of an ice cream truck, who had given its lessee-operator a safety manual in which safety procedures for child patrons were set forth, did not voluntarily assume a legal duty to protect children from traffic hazards where such a duty had not otherwise been imposed by Alabama law. However, Martin is best understood as an example of judicial reluctance to find a duty where the Alabama legislature has not previously recognized such duty. See 695 So.2d at 1179 n. 1.
In Martin, an automobile struck and killed a child when the child stepped into a street after purchasing ice cream from a Goodies ice cream truck. 695 So.2d at 1176. However, no evidence indicated that Goodies had entered into any contract with an entity, such as a school, by which it assumed a duty to assure the safety of child patrons crossing streets before or after purchasing ice cream at one of its trucks. See id. at 1178-79. Had that been the case, the manual would have been relevant to the issues of the foreseeability of an accident such as the one in which the decedent was killed and the scope of Goodies' duty. Martin is therefore distinguishable from the present case; we are not presented in this case with a naked question of public policy as to whether to create a new duty, in light of the evidence of the contractual duties to the motel assumed by Lance.
 B. Causation
Lance next contends that the trial court erred in submitting the parents' negligence claim to the jury because, it says, the actions of the motel and Montgomery Coca-Cola were intervening causes and the proximate cause of the child's death. An intervening cause must be unforeseeable and must have been sufficient to have been the "sole cause in fact" of the injury. General Motors v. Edwards, 482 So.2d 1176, 1195 (Ala. 1985). Given the evidence of foreseeability summarized in our discussion of the existence of a duty earlier in this opinion, we conclude that the question of causation was properly submitted to the jury. Tuscaloosa *Page 1211 
County v. Barnett, 562 So.2d 166, 169 (Ala. 1990).
 C. Wantonness
Lance contends that the evidence was insufficient to support submission of the case to the jury on the issue of wantonness. In Alfa Mut. Ins. Co. v. Roush, [Ms. 1950232, September 11, 1998]723 So.2d 1250 (Ala. 1998), this Court stated, "To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." Wantonness is defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). In Roush, citing Baseman v. Central Bank of the South, 646 So.2d 601 (Ala. 1994), we described wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act injury will likely or probably result." 723 So.2d at 1250.
The parents argue that they presented ample evidence tending to show that Lance acted wantonly. Although much of the evidence marshaled by the parents relates to Lance's conduct after the child's death, the evidence they presented relating to Lance's conduct before the child's death was sufficient for the trial court to submit the wantonness claim to the jury. In addition, we note that Lance has not challenged the evidence of its conduct after the accident on grounds of relevancy. Because evidence of duration of the conduct is relevant to the issue of punitive damages under Green Oil Co. v. Hornsby, 539 So.2d 218, 223 (Ala. 1989), and BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), we include the evidence of Lance's conduct both before and after the child's death in the following summary.
Lance's routeman checked the machine weekly; however, even at the time of the trial — some two and one-half years after the child's death — he demonstrated a lack of knowledge concerning electrical safety and grounding. Lance's routeman had received no training on grounding, either before or after the child's death, and although he carried the safety manual in his truck, he was unaware of its contents concerning electrical safety or grounding. He also admitted that he was not provided with a $5 electrical-outlet tester, referred to by the parents' expert, and that had he been trained to use such a tester and had one been provided, he certainly would have used it. Furthermore, as of the date of trial no one had ever told him that the ungrounded outlet into which the machine he serviced was plugged had caused the child's death. He had installed six additional machines since the child's death without checking the outlets for grounding. According to the routeman's supervisor, nobody at Lance was responsible for field safety or the safety of users of the machines.
The parents also rely on the testimony of other Lance employees. The routeman's supervisor testified that none of the 225 vendors located in his district had been tested for proper grounding. The supervisor also stated that when new machines are installed they are plugged in and if the machine works, nothing else is done; he was unaware of any plans to alter this practice in the future. Furthermore, Lance's human resource manager, the corporate representative most knowledgeable about safety rules, regulations and procedures, testified that he did not learn of the child's death until he was being prepared for his deposition, some 21 months after the death. The safety representative, acknowledging that he now knows vending machines have to be grounded to be safe, testified that he had never seen Lance's safety grounding requirements until he was preparing for the trial, that no action had been taken to assure compliance with the safety manual, that nothing was being done differently after the child's death, and that there were no plans to make sure that all field personnel were aware of the *Page 1212 
warnings and instructions in the safety manual concerning grounded receptacles. He also conceded that had the vending machine been plugged into a grounded receptacle, the child would not have been electrocuted. On the other hand, Lance's vice president of sales administration testified that a program for routemen to test electrical outlets for grounding had been put in place.
In response to the parents' contentions, Lance, in effect, argues that we must read that part of the definition of wantonness in Roush stating that wantonness is "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions" to mean that unless Lance knew that the outlet into which its vending machine was plugged was not grounded, it could not be liable. We view the question of Lance's knowledge differently. We find the critical question to be whether it knew the necessity for testing electrical receptacles to which its vending machines are connected for adequate grounding at facilities such as the motel where this death occurred. As previously noted, the evidence of Lance's practices before the child's death, when coupled with the contents of Lance's safety manual and the expert opinion testimony concerning foreseeability, was sufficient to show circumstances from which one could reasonably infer such knowledge. See Hamme v. CSX Transp., Inc., 621 So.2d 281, 283 (Ala. 1993) (stating that to show wantonness "[t]he actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference"). We therefore hold that the trial court properly presented to the jury the question whether Lance was guilty of "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3).
 II. Jury Confusion and Verdict Unanimity
Lance argues that the trial court erred in denying its motion for a new trial because, it says, the jury was confused as to whether it or the trial court was responsible for deducting from the verdict the amount of the pro tanto settlements. That confusion, it says, violated its right to a fair trial. Lance also contends that the trial court erred in denying its motion for a new trial because, it says, the trial court did not adequately ensure the unanimity of the verdict, and that its failure to do so violated its right to due process and its right to a unanimous verdict in a trial by jury.
During the trial, the jury was informed of the pro tanto settlements, pursuant to which the motel paid the parents $7 million and Montgomery Coca-Cola paid them $3 million. At the close of the evidence, both sides requested that the trial judge give instruction 11.30, Alabama Pattern Jury Instruction: Civil ("APJI 11.30"), which instructs the jury that it must reduce its award by the amount of any settlements by other parties. During the charge conference, however, the parents obtained permission from the trial court to argue during their closing statement that the court, not the jury, should be responsible for reducing the verdict by the amount of the pro tanto settlements. Although this argument was directly contrary to APJI 11.30, Lance did not object.
The parents' closing argument included the following statement: "If indeed you intend to award a dollar to Michael and Tela Ramanauskas in this case, you'd have to add $10 million to it in order for them to be awarded a dollar." The parents never argued to the jury that it was the trial judge's responsibility to deduct the amount of the pro tanto settlements from the amount of the verdict. Again, Lance did not object.
At the conclusion of the closing arguments and just before the trial court's charge, Lance again asked the judge to give APJI 11.30, asking, "In the charge on pro tanto, can you give one right out of the [Alabama] Pattern Jury Charges?" The trial court replied, "You both submitted *Page 1213 
the same charge." The trial court then gave its oral charge; that charge included APJI 11.30. At the end of the charge, Lance, for the first time, complained of an inconsistency between the parents' closing argument and the charge.
After Lance expressed concern about a possible inconsistency, the parents requested that the trial court reread APJI 11.30 to the jury before allowing the jury to begin its deliberations. Lance agreed that recharging the jury was the proper way to remedy any possible confusion. The trial court then addressed the jury on the subject of "the effect of the $10 million previously paid," and instructed the jury to "determine from the evidence the total amount of damages suffered by the plaintiff and then give credit for the amount of $10 million which Plaintiffs have already been paid . . . and render a verdict for the balance remaining." After the additional instruction, both sides stated that they had no exceptions to the charge.
When the jury returned a $13 million verdict against it, Lance asked that the jury be polled as to whether they meant to return a verdict of $3 million or $13 million. A juror, hearing Lance's request, blurted out, "Three." Lance did not then ask that the jury resume deliberations. The trial court polled the jury, restricting that polling solely to whether the verdict was the verdict of each and every juror. All the jurors responded affirmatively. During the polling of the jurors, a colloquy between the court and the juror who had blurted out "Three" led to her statement that she had had "a misunderstanding of what was awarded." The trial court said that it was not trying to badger the juror or to elicit anything but an honest response from her and told her, "If it is your verdict, ma'am it is. If it isn't, it isn't." She answered, "Yes." The trial court then asked her one more time, "This is your verdict?" She replied, "Yes." No other juror expressed any concerns.
After polling the entire jury, the trial court returned to the juror who blurted out "Three" and said, "And again, . . . please understand, all I'm trying to find out is, is this your verdict? Out of an abundance of caution, let me please ask you again. . . . [I]s this your verdict?" To which the juror responded, "Yes, it is." After the jury was discharged, Lance attempted to impeach the jury's verdict by offering four affidavits from jurors who stated that they intended to award $3 million, not $13 million. The parents countered with affidavits from three jurors denying any confusion and supporting the verdict; those affidavits stated that those jurors supported an award higher than $13 million but that they could not get unanimous support for a verdict in excess of $13 million.
Lance contends that the differences between what was agreed to at the charge conference, what was argued during closing argument, and APJI 11.30 left the jury so confused that Lance's right to a fair and impartial trial was violated. Lance says this confusion is evidenced by the colloquy with the juror who blurted out, "Three," and by the four juror affidavits it submitted to the trial court, in which the jurors stated that they intended to award the parents $3 million, not $13 million. However, we conclude that Lance is precluded from arguing that the giving of APJI 11.30 confused the jury. As previously noted, Lance did not object to the parents' request for permission to make the allegedly confusing argument to the jury, nor did it object to the argument itself. In fact, Lance expressed its approval of the trial court's additional charge. This Court held in Bush v. Alabama Farm Bureau Mut. Cas. Ins. Co., 576 So.2d 175, 181 (Ala. 1991), that the plaintiffs waived their right to challenge the trial court's supplemental charge after the plaintiffs requested that the trial court "clean up" the confusion created by its original charge, but did not object to the trial court's subsequent charge. Therefore, Lance waived any objection to the trial court's supplemental *Page 1214 
instruction by expressing its satisfaction with the rereading of APJI 11.30.
Lance also contends that the fact that one of the jurors blurted out "Three," proves that the verdict was not unanimous. We disagree. When that juror expressed confusion about the verdict, the trial court was authorized to determine whether the verdict represented her convictions. See Winslow v. State, 76 Ala. 42
(1884), and Martin v. State, 23 Ala. App. 281, 124 So. 392, cert. denied, 220 Ala. 149, 124 So. 393 (1929), both of which were followed in Comer v. Rush, 403 So.2d 205 (Ala. 1981). The trial court did so by properly restricting the polling of the jury to the issue whether the verdict was the verdict of each and every juror. See Ala. Code 1975, § 12-16-15. As noted above, all the jurors responded in the affirmative to the polling. Moreover, the juror who blurted out "Three" affirmed her verdict twice during the polling. The verdict was unanimous, contrary to Lance's assertion.
We reject Lance's argument that the four affidavits attacking the verdict also prove that the verdict was not unanimous. These affidavits provoke the "swearing match" to which Rule 606(b), Ala.R.Evid., is directed. That rule provides:
 "Upon an inquiry into the validity of a verdict . . ., a juror may not testify in impeachment of the verdict . . . as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict. . . ."
This rule makes jurors "incompetent to testify, either orally or by affidavit, as to the deliberations of the jury when offered to attack the validity of a verdict or indictment." Gamble's Alabama Rules of Evidence § 606, p. 171 (1995). See, also, Advisory Committee's Notes to Rule 606. In addition, we have previously held inadmissible juror affidavits attacking a verdict on the basis of alleged confusion over who would deduct the amounts paid in a pro tanto settlement, because those affidavits deal with the substance, not the form, of the verdict. Kumar v. Lewis,561 So.2d 1082 (Ala. 1990); Great Atl. Pac. Tea Co. v. Sealy,374 So.2d 9877 (Ala. 1979).
Lance, however, attempts to stretch the exception in Rule 606(b) to those cases in which juror testimony is necessary to show juror attentiveness to "extraneous prejudicial information." Lance argues that the unobjected-to statements of the parents fall into the category of "extraneous prejudicial information," which would be admissible under Rule 606(b). We think that the trial judge correctly disposed of this argument in his posttrial order:
 "This argument strains credulity. The courts of this state have generally limited the scope of this exception to the visitation of a crime scene by a juror, the introduction of the definition of legal terms in the jury room, and [the reading of] concepts from general reference books. See Dawson v. State, [710 So.2d 467](Ala.Crim.App. 1996); Jordan v. Brantley, 589 So.2d 680 (Ala. 1991); Nichols v. Seaboard Coastline, 341 So.2d 671 (Ala. 1976). These scenarios do not remotely approach the facts of this case."
In addition, we recognize that the courts of this State have interpreted the exception in the same manner. See McElroy's Alabama Evidence, § 94.06(4)(a), p. 458-59 *Page 1215 
(5th ed. 1996), and cases cited therein. Accordingly, the trial court did not err in refusing to grant a new trial on the basis of lack of a unanimous verdict.
 III. Prejudicial Comments by the Parents' Attorneys
Lance next argues that the trial court erred in refusing to order a new trial because, it says, the parents' attorneys made improper references during the trial to Lance's financial condition, to the fact that Lance had liability insurance, to compensatory damages for the child's death when only punitive damages are recoverable in a wrongful-death action, and to the parents' mental anguish. It argues that these references were so highly prejudicial as to require a new trial or a remittitur.
We first address Lance's concerns about improper references to compensatory damages and to the parents' mental anguish. In their opening statement, the parents' counsel commented on the suffering of the parents and the family, specifically stating that a family reunion had ended in tragedy. Lance objected to this comment on the ground that the comment went to improper matters, i.e., damages. The trial court overruled the objection. The parents' counsel continued, referring to the day of the child's death as the day "his family's peace ended." Lance again objected on grounds that counsel was "injecting damages not a part of this lawsuit"; it moved for a mistrial. The trial court denied the motion. Lance then asked the trial court to instruct the jury "to ignore that kind of remark insofar as damages are concerned." The trial court did not instruct the jury to disregard the argument concerning the impact of the child's death on the family. Instead, the court reiterated its instruction that an opening statement is what a lawyer expects the evidence to reveal, and the court stated, "Should you find that any lawyer deviates from an expectation of what the evidence will be, then you are to disregard what you determine to be a deviation."
In closing argument, the parents' counsel began with the following emotional appeal: "A nice happy day of reunion suddenly turned into a nightmare that will never, ever end." The trial court overruled Lance's objection on the ground that counsel was merely trying to evoke sympathy and to prejudice the jury against Lance. Counsel for the parents continued, saying, "A completely satisfying day of joy and happiness for a family on a reunion is suddenly ripped with a life-size hole that will never be filled." Lance again objected. The trial court responded that the comment was proper argument and that it was for the jury to determine whether it represented a reasonable inference that could be drawn from the evidence. Later, counsel for the parents spoke of the parents' "unspeakable burden" in the loss of their child. Again, Lance's objections were overruled. The trial court denied Lance's motion for a new trial and its request for a remittitur.
This Court held in Seaboard Coast Line R.R. v. Moore,479 So.2d 1131, 1136 (Ala. 1985), that "[t]he standard of review on claims of improper argument is that we will not reverse unless substantial prejudice resulted, and there is a presumption in favor of the trial court's ruling." In addition, this Court has recognized the curative powers of effective corrective instructions where the trial court instructs the jury to disregard an improper statement and further admonishes the jury that it is to decide the case solely upon the evidence from the witness stand, with all proper and reasonable inferences that can be drawn from the evidence and that it is not to decide the case based on bias or on sympathy. See, e.g., United American Insurance Co. v. Brumley,542 So.2d 1231, 1237 (Ala. 1989).
We conclude that during opening statement and summation, the parents' counsel crossed the line that separates proper argument in a wrongful-death case (i.e., "the value of human life in general") from improper argument (i.e., "the value of a particular *Page 1216 
life"). Atkins v. Lee, 603 So.2d 937, 942 (Ala. 1992). The trial court's rulings in response to Lance's objections did not meet the standards applied in United American Insurance. The trial court's corrective instruction during the opening statement by parent's counsel did not instruct the jury to disregard the improper argument; the instruction abdicated to the jury the function of determining what was proper argument. During summation, the trial court did not instruct the jury to disregard counsel's blatant appeals to passion or prejudice.
We recognize that the trial court correctly instructed the jury that only punitive damages could be awarded in a wrongful-death case. Our cases have held that such an instruction can dispel possible confusion over the proper measure of damages generated by an improper argument as to the value of a particular life. Atkins, supra, 603 So.2d at 942. However, if counsel can make this prejudicial argument with impunity, knowing that a charge on punitive — not compensatory — damages will be given and that this Court will then overlook the improper argument on that basis, there is no meaningful disincentive to making such improper and prejudicial arguments, other than the risk of going too far and leading to a mistrial. But this Court in Airheart v. Green,267 Ala. 687, 104 So.2d 689 (1958), upheld the trial court's denial of motion for a new trial conditioned on a remittitur of so much of the verdict as could be attributed to bias, passion, or prejudice. This Court also held in Airheart that the trial court's instruction as to the proper measure of damages in a wrongful-death case corrected any misconception generated by an impermissible reference to the decedent's age. We likewise consider a remittitur to be the appropriate method of dealing with the improper arguments in this case.
In the years since this Court embarked on establishing particularized standards for measuring whether a punitive damages verdict is excessive, we have not abandoned the rule that a verdict is excessive when it is the product of bias passion or prejudice. See Hammond v. City of Gadsden, 493 So.2d 1374, 1379 (Ala. 1986). The impropriety of the arguments in this case as to the value of the child's life in particular might have caused the jury to award punitive damages on the basis of passion or prejudice. This Court held in Atkins v. Drake, 437 So.2d 469 (Ala. 1983), that "[i]n a case of improper argument, where the trial judge overrules objection and fails to instruct the jury as to the impropriety with direction to disregard, the test upon appeal is not that the argument did unlawfully influence the jury, but whether it might have done so. [Citation omitted.]" (Emphasis added.) When improper argument is made as to the issue of damages and the trial court does not sufficiently address the effects of that improper argument, a new trial is not the sole recourse. In cases such as this one, where there is substantial evidence to warrant submission of the liability issue to the jury, the trial court should also have the authority to deal with an improper argument as to damages through a remittitur. Other jurisdictions have found improper argument on the issue of damages to be a proper basis for a remittitur. See 75A Am.Jur.2d Trial § 651 (1991), and the cases cited therein (an improper "golden rule" argument may provide the basis for remittitur). To the extent that Alabama Fuel Iron Co. v. Andrews, 212 Ala. 336, 102 So. 799 (Ala. 1925),[2] stands for the proposition that a trial court cannot employ remittitur to deal with the prejudicial effects of improper argument on the amount of damages, it is overruled.
Lance also argues that the trial court erred in failing to grant a new *Page 1217 
trial because, it says, the parents improperly referred to Lance's financial condition and to the fact that Lance was covered by liability insurance. These areas of alleged improper argument go to matters other than damages; therefore, they cannot be dealt with by a remittitur. A trial court's decision to deny a motion for a new trial "rests within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless some legal right was abused and the record plainly and palpably shows that the trial court was in error." Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38,45 (Ala. 1990). In addition, improper arguments, questions, and comments by a party's counsel can be so prejudicial that a new trial is warranted. See Ridgeview Health Care Center, Inc. v. Meadows, 590 So.2d 243 (Ala. 1991) (reversing the trial court's denial of the defendant's motion for a new trial because the arguments made by the plaintiff's counsel were highly prejudicial and probably influenced the jury); see, also, Estis Trucking Co. v. Hammond, 387 So.2d 768 (Ala. 1980) (counsel's references to the defendant's wealth and his request that the jury put itself in the place of the plaintiff required a new trial).
We have thoroughly reviewed those portions of the record that Lance contends require a new trial. The record does not "plainly and palpably show" that the trial court erred in denying Lance's motion for a new trial on the grounds that the parents improperly referred to Lance's financial condition and to the existence of liability insurance.
First, Lance objected to almost none of the alleged references to Lance's corporate wealth. In addition, some of the alleged references were not, in fact, references to Lance's wealth. The parents did not mention Lance's financial worth in any way. Instead, the parents focused on Lance's size and the number of machines it owned as relevant to Lance's sophistication and its expertise within the industry. Second, none of the testimony that Lance maintains constitutes improper references to liability insurance can be read as showing, either directly or indirectly, that Lance's possible losses were covered by liability insurance, as the rule prohibiting references to liability insurance requires. See Pi Kappa Phi Fraternity v. Baker, 661 So.2d 745, 748 (Ala. 1995). Therefore, we affirm the trial court's denial of the motion for a new trial on these grounds.
 IV. Excessiveness of Damages
Lance next argues that the damages award was excessive and that the trial court erred in refusing to set aside the verdict and order a new trial or to remit the damages.
This Court has long recognized that a new trial may be required when a jury's damages award is excessive. See McAdory v. Louisville Nashville R.R., 94 Ala. 272, 10 So. 507 (1892). Of equal longevity is the recognition that a remittitur can avoid the expense and delay of a new trial when the fact that the damages award is excessive is the only possible reason for a new trial. See Richardson v. Birmingham Cotton-Mfg. Co., 116 Ala. 381, 384,22 So. 476, 478-79 (1897) ("Remittiturs are favored by the courts in proper cases, for the promotion of justice and the ending of litigation.") (emphasis in original); see, also, Ala. Code 1975, § 12-22-71 (an appellate court may order a remittitur "because the judgment of the lower court is excessive and there is no other ground for reversal"). Of course, the recognition that a jury's verdict may be so excessive as to require a new trial or a remittitur created the need to develop standards for determining when a jury's verdict must be set aside on the basis of excessive damages. As this Court noted in Hammond v. City of Gadsden, supra, 493 So.2d at 1378, a court may interfere with a jury's verdict only when it is "flawed":
 "In so far as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported *Page 1218 
by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. In these situations, a trial court may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law. Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive. It is this category of cases that most troubles both trial and appellate courts."
In Green Oil Co. v. Hornsby, supra, this Court expanded upon its holding in Hammond, and enumerated seven factors to be considered in a post-verdict review of an award of punitive damages. In so doing, this Court stated that a punitive-damages award is subject to review for excessiveness under the original passion-and-prejudice test — to determine whether the damages award was the result of an improperly functioning jury — as well as under the new factors — to determine whether the damages award was the result of a properly functioning jury whose members did not "exceed an amount that will accomplish society's goals of punishment and deterrence." Green Oil Co., 539 So.2d at 222.
In reviewing a trial court's denial of a motion for a new trial filed on the basis of an allegedly excessive damages award or the denial of a remittitur, we must consider whether the jury's verdict was based on passion or prejudice and review the factors set out in Green Oil Co. In addition, we must consider the three "guideposts" established by the United States Supreme Court in BMW v. Gore, supra, to determine whether a punitive-damages award violates a defendant's right to due process.
In applying those considerations to the present case, we conclude that the jury's verdict is subject to a remittitur because the parents' counsel improperly referred to compensatory damages and improperly appealed to the sympathy of the jury, resulting in a damages award that was improperly based on passion or prejudice.
In addition, our review of the BMW "guideposts" and the Hammond-Green Oil factors indicates that the jury's verdict is excessive:
(1) Ratio of Punitive Damages to Compensatory Damages: Because Alabama law does not allow the recovery of compensatory damages in a wrongful-death case, this factor is not applicable. Until the legislature amends the wrongful-death statute to allow compensatory damages for economic loss or allows recovery for mental anguish as part of punitive damages, our task in assessing the appropriate punitive damages in a wrongful-death case will remain extremely difficult.
(2) Reprehensibility of the Defendant's Conduct: The jury verdict is consistent with a finding that it was reasonably foreseeable that someone would be electrocuted by Lance's vending machines. The jury's verdict is also consistent with a finding that Lance was guilty of "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others," and that this conduct caused the child's death. "[A] state can make homicide expensive." Cherokee Elec. Co-op. v. Cochran,706 So.2d 1188, 1194 (Ala. 1997), citing Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 116 (1927) ("We cannot say that it is beyond the power of a legislature . . . to attempt to preserve human life by making homicide expensive."). Furthermore, as summarized above, the parents provided ample evidence that Lance has not taken remedial steps to prevent similar electrocutions from occurring.
We find interesting parallels and contrasts in the degree of culpability of Montgomery Coca-Cola, the owner of the vending machine adjacent to and in physical contact with the Lance machine by which the child was electrocuted. On the other hand, Montgomery Coca-Cola's culpability *Page 1219 
in terms of its awareness of problems with its vending machines in general and at this site in particular before the child's death was greater than that of Lance. However, the evidence as to Lance's disregard of its own safety manual and the evidence, albeit disputed, of its continuing course of conduct after the incident, and the proof that it was Lance's machine and not Montgomery Coca-Cola's that caused the death, suggest that Lance's conduct was more reprehensible than that of Montgomery Coca-Cola.
We recognize that in light of the evidence, although conflicting, indicating Lance's intention not to change its current practices regarding the safety of its vending machines, the jury was justified in finding that a substantial damages award was necessary to deter Lance from failing to make its vending machines reasonably safe for its consumers. On the other hand, the motel's callous disregard of actual notice of the problem entitles it to the highest place in this infamous hierarchy of reprehensibility.
Therefore, we hold that the degree of the reprehensibility of Lance's conduct requires a remittitur because Lance's conduct, while reprehensible, was not the most reprehensible conduct of those parties involved in this action. The jury verdict against Lance in the amount of $13 million, if left unaltered, would wrongly treat Lance as the most culpable defendant.
(3) Similar Civil and Criminal Sanctions: Lance has not been criminally sanctioned for its conduct, nor have others sued Lance in any civil action based upon the same conduct. Therefore, these factors do not require a remittitur. However, under BMW v. Gore, we must compare the damages awarded in this case to damages awarded in similar cases. The trial court, in denying Lance's motion for a remittitur, relied on several pre-BMW fraud cases. Those cases are not analogous to wrongful-death cases; therefore, those cases are not a proper basis for the denial of a remittitur.
We find that this verdict is considerably higher than the awards in recent wrongful-death cases in which this Court has affirmed judgments entered on significant jury verdicts. This BMW guidepost also mandates a remittitur. In Cochran, supra, this Court affirmed a $3 million award against Cherokee Electric after a fireman was electrocuted when he came into contact with one of Cherokee's electric lines. More recently, this Court remitted an award of $7 million to $1.5 million in Tillis Trucking Co. v. Moses, [Ms. 1960674, January 8, 1999] ___ So.2d ___, ___ (Ala. 1999), partially because the award was "considerably higher" than the awards in similar cases. In addition, the only other recent electrocution case resulted in a remittitur of a $5 million award to $3.5 million. Alabama Power Co. v. Turner, 575 So.2d 551 (Ala. 1991).
We are mindful of other wrongful-death cases in which this Court has affirmed substantially larger awards. See Atkins v. Lee,603 So.2d 937 (Ala. 1992) ($6,875,000 award affirmed in a medical malpractice case for the wrongful death of a minor); General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala. 1992) ($15 million punitive-damages award in products liability action for the wrongful death of a minor was remitted to $7.5 million). However, we note that both Atkins and Johnston involved evidence of particularly egregious actions of concealment and deceit by the defendants. In Atkins, the plaintiff offered evidence that the defendant had lied to another doctor to conceal the mistake that caused the decedent's death. In Johnston, the plaintiff offered evidence that General Motors concealed from the public the defect in its vehicles that caused the decedent's death and did not notify any of its purchasers of the defect. Therefore, because Lance did not engage in any cover-up or deceit in the present case, Atkins and Johnston are distinguishable.
Furthermore, Lance's codefendants, who entered into pro tanto settlements *Page 1220 
with the parents, paid a total of $10 million, $3 million less than the $13-million jury verdict against Lance. The motel, the most culpable of the defendants because its handyman wired the electric receptacle into which the vending machine was plugged with reversed polarity and its management failed to react to complaints made immediately before the child's death that the machines were shocking users, settled for $7 million. Montgomery Coca-Cola, although culpable because it admitted that it knew its machines at many locations shocked people every year, which is more than Lance indicated it knew, paid the substantially lesser sum of $3 million. However, we are also aware that, unlike the motel and Montgomery Coca-Cola, Lance elected to proceed to trial, thereby increasing the parents' costs of litigation, which we may take into account. See Green Oil Co., supra, 539 So.2d at 223. Even so, the comparison to the similar cases discussed above requires a remittitur. We are constrained to observe that the opinions of able counsel in an adversarial system as to the proper measure of damages, as evidenced by the amounts paid in the pro tanto settlements, are highly credible benchmarks upon which to rely in this case in attempting the difficult task of fixing the appropriate amount of punitive damages.
(4) The Profitability of the Defendant's Conduct: Lance may have "profited" by not training its employees to ensure that the receptacles into which its machines were plugged were properly grounded; however, the record contains no evidence of the amount of that profit, if there was any. The record indicates that Lance saved $5 per service technician by not equipping its technicians with a device for testing the receptacles for grounding; however, it is unclear how many service technicians Lance employed or how many devices were needed to ensure the safety of Lance's machines. Therefore, we cannot determine whether Lance profited by its conduct or, if it did, whether that profit justifies the award of punitive damages.
(5) The Financial Position of the Defendant: Lance presented no evidence of its net worth. Instead, the record indicates that Lance's entire loss will be covered by its insurance carrier. Lance produced no evidence showing that the verdict will affect its future insurability. Therefore, this factor does not require a remittitur.
(6) Costs of Litigation: Lance presented no evidence indicating that costs of litigation show that the verdict is excessive, and the parents have not presented any evidence that the costs of litigation justify the award. Therefore, this factor does require a remittitur.
Finally, Lance argues that we must remit the damages award because the jury impermissibly based part of the award on Lance's conduct in other states, in violation of the United States Supreme Court's prohibition in BMW. Lance maintains that the parents' counsel repeatedly appealed to the jury to consider Lance's activities outside of Alabama. We disagree.
First, Lance waived most of its objections to the evidence it alleges to be improper comments on its conduct outside Alabama. Lance's objections to these reference were made on the basis that the parents' counsel was attempting to inject Lance's financial condition into the trial. These specific objections waive all other objections. See State v. Holloway, 293 Ala. 543,307 So.2d 13 (1975) (when a party states a specific ground for its objection, all other unstated grounds of objection are deemed waived).
Second, as to the one reference to which Lance did properly object in the parents' closing argument, the trial court sustained Lance's objection and gave a curative instruction, telling the jury that it could not base its award of damages on Lance's activities outside of Alabama. When an objection to improper argument is sustained and the trial court admonishes the jury, the "test on motion for new trial or on appeal is whether the argument was *Page 1221 
so harmful and prejudicial that its influence was not and could not be eradicated by the action of the court." Estis Trucking Co., supra, 387 So.2d at 772.
In the present case, the parents' counsel did not either directly or indirectly mention any wrongful acts committed by Lance in other states, nor did the parents' counsel ask the jury to punish Lance for acts committed outside of Alabama, as the plaintiff's counsel did in BMW. See BMW of North America, Inc. v. Gore, 646 So.2d 619, 627 (Ala. 1994), rev'd on other grounds,517 U.S. 559 (1996). In fact, the parents' counsel specifically asked the jury in closing argument not to punish Lance "for what it does in other states." Because the argument by the parents' counsel was not directed at Lance's conduct in other states, we hold that the trial court's instruction erased any prejudice. Consequently, these alleged references do not provide a basis for a remittitur.
We therefore hold that the judgment entered on the verdict against Lance must be remitted for four reasons: (1) the improper comments made by the parents' counsel regarding the availability of compensatory damages in a wrongful-death action and the parents' mental anguish as a measure of damages, (2) the trial court's improper use of pre-BMW fraud cases to evaluate the jury's award of damages in this case, (3) the vast difference in the amount of the jury's verdict in this case as compared to verdicts in similar cases, and (4) the disparity between the jury's verdict and the amounts of the pro tanto settlements entered into by the motel and Montgomery Coca-Cola. For these reasons, we affirm the judgment, conditioned upon the parents' filing a remittitur of the award to $4 million within 28 days of the release of this opinion; if the parents do not file a remittitur within that time, the judgment will be reversed and this cause will be remanded for a new trial. American Pioneer Life Ins. Co. v. Williamson, 704 So.2d 1361, 1367
(Ala. 1997).
We are not unmindful that if this remittitur is accepted by the parents, a total of $14 million will have been paid in connection with the child's death. However, one of three co-conspirators in a murder prosecution could not obtain leniency on the theory that because two co-conspirators had already entered pleas of guilty and received a total of 50 years' imprisonment, the State had exacted sufficient retribution for the crime. By the same token, Lance cannot reduce its liability by arguing that the verdict, when combined with the amounts of the pro tanto settlements, is excessive. We further note that this Court has, under the crushing weight of 150 years of stare decisis, consistently held that our wrongful-death statute allows for the recovery of punitive damages only. See Tillis Trucking, supra, ___ So.2d at ___. Had there been no settlements and the three defendants suffered a judgment at a joint trial, their liability would have been joint and several, and the excessiveness of the verdict would have been measured by the enormity of the collective wrongdoing. See Black Belt Wood Co. v. Sessions, 514 So.2d 1249
(Ala. 1986). However, as long as we are bound by precedent to limit recovery of damages in a wrongful-death case to punitive damages, we must expect results such as the one in this case.
AFFIRMED CONDITIONALLY.* *Page 1222 
Hooper, C.J., and Houston, Cook, and Brown, JJ., concur.
Kennedy and See, JJ., concur in the result.
[1] The parents contend that Lance's motion for a JML was not sufficiently specific to preserve this issue for review. However, we do not address the parents' preservation argument because the parents produced evidence from which the jury could have found that Lance owed a duty to the child.
[2] When Alabama Fuel Iron Co. was decided, a "scintilla" of evidence was sufficient to permit submission of a case to a jury in Alabama. The scintilla rule was abolished as to civil actions filed after June 11, 1987. Ala. Code 1975, § 12-21-12.
* Note form the reporter of decisions: On March 30, 1999, the Supreme Court entered the following "Certificate of Judgment":
"WHEREAS, in keeping with the former order and judgment of this Court entered on March 5, 1999, the appellants having, on March 22, 1999, shown the plaintiffs' acceptance of remittitur,
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $4,314.301.36 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
"IT IS FURTHER ORDERED AND ADJUDGED that the appellant, Lance, Inc., pay the costs of appeal and the costs taxed against the defendant in the court below will stand as taxed."