SHAW, Justice.
In these consolidated appeals, Pensacola Motor Sales, Inc., d/b/a Bob Tyler Toyota (“BTT”), one of two named defendants below, appeals in case no. 1110840 from a judgment entered on a jury verdict in favor of Daphne Automotive, LLC, d/b/a Eastern Shore Toyota (“EST”), and Shawn *933 Esfahani, the plaintiffs below, on the plaintiffs’ claims seeking damages for slander. In case no. 1110857, Fred Keener, an employee of BTT and a codefendant, similarly appeals from the judgment against him and in favor of EST and Esfahani.

Facts and Procedural History

In December 2007, Esfahani, who was born in Iran but who is a United States citizen, opened EST, an automobile dealership selling Toyota vehicles, in Daphne. Esfahani serves as both owner and manager of EST. EST is a direct competitor of BTT, which has, since 1997, operated a Toyota-brand automobile dealership in Pensacola, Florida. Bob Tyler, president and sole owner of BTT, had competed with Esfahani for a new Toyota dealership that was to be opened in Baldwin County. The record suggests a history of “bad blood” between Esfahani and Tyler in that in 2010 they were also involved in federal litigation related to alleged “cybersquatting” by EST based on EST’s online advertising practices; EST successfully defended against BTT’s claims.
Esfahani ultimately learned of slanderous statements made about him and/or EST by employees of BTT, including, in an apparent effort to discourage potential customers from purchasing from EST, BTT’s agents’ purportedly informing customers that Esfahani and/or EST “are engaged in illegal activity, are terrorists, or otherwise support terrorist organizations.” More specifically, BTT and its employees purportedly referred to EST as “Middle Eastern Shore [Toyota]” or “Taliban Toyota.”
In January 2010, EST and Esfahani sued BTT and Keener in the Mobile Circuit Court, seeking damages based on claims of slander per se, slander per quod, and intentional interference with business relationships. As a result of the alleged slanderous remarks by the defendants or their agents, Esfahani and EST alleged that they “ha[d] been deprived of public confidence that they had prior to said acts ... and [their] business reputation has been damaged and the business has lost profits and has otherwise been devalued.”
The matter ultimately proceeded to a jury trial, during which, according to the trial court, the evidence demonstrated the following:
“The evidence at trial showed repeated instances of defamation by the Defendants. Pastor Michael Bonham testified that BTT salesman Joe Carp[1] repeatedly told Bonham and his wife, Barbara Bonham, that ... Esfahani ... was from Iraq, was Tunneling money back over there to his family to help fund terrorists,’ and that Esfahani was ‘hoping to try to get [Carp’s brother who was serving in the military over there] in harm’s way.’ ...
“Mrs. Bonham test drove two vehicles with ... Carp. During both test drives, Carp made comments ‘over and over, about ... well, at least I’m not a terrorist [a]nd he would say something about Middle Eastern Shore Toyota [and, again,] at least I’m not a terrorist.’ ... Between test drives, Carp reiterated: ‘You do understand that the owner over there is from Iraq and that he indeed is shipping money back over there to help pay for terrorists?’ ... Throughout the Bonhams’ visit to BTT, Carp repeatedly asserted that Esfahani and [EST] were terrorists or otherwise funded terrorism.
“As the Bonhams were leaving the dealership, Carp introduced them to Defendant Fred Keener, BTT’s new car sales ’manager. Keener unsuccessfully tried to close a deal with the Bonhams. When they could not come to terms on price, Keener advised the Bonhams: “You do know that the owner from over *934 there at [EST] is from Iraq and that we refer to that ... as Little Iraq and ... the owner over there - is sending money back to his family over in Iraq to fund terrorists.’ ... Both Bonhams also testified that Keener attempted to dissuade them from even visiting EST by questioning their patriotism: You’re a patriotic American, aren’t you? ... well, you need to think about that then’ and ‘y°u just need to keep all that in mind’; and, ‘remember your American patriotism
“Despite the efforts of Keener and Carp, the Bonhams did visit EST, but not before debating the propriety of shopping at EST. Pastor Bonham testified the Bonhams had significant misgivings about EST. Once at EST, however, the Bonhams’ fears were allayed, and they decided to buy a car. While Ms. Bonham was signing- the paperwork, Carp called the Bonhams’ cell phone to re-engage in purchase negotiations. When Pastor Bonham informed him the Bonhams had decided to buy a car from [EST], Carp responded: T can’t believe you’re funding terrorists through that organization like that. You know he’s from Iraq and you know he’s sending money over to his family and you’re trying to kill my brother.’ ...
“Pastor Bonham reported this conversation with Carp to EST management. After [Esfahani and EST] had received a number of reports that BTT salesmen were making slanderous statements about them (most notably, but not solely, from the Bonhams), [Esfahani and EST] sent BTT a cease and desist letter on July 31, 2009. [Esfahani and EST] specifically cited Carp’s conduct and demanded a retraction. By letter dated August 24, 2009, BTT’S attorney responded to [Esfahani and EST’s] letter stating BTT had ‘made a determination that one of the employees might have made an inappropriate remark and swiftly disciplined the employee.’ BTT’s ‘swift discipline’ turned out to be warm ing Carp that he would be fired the next time he slandered EST.
“... Esfahani testified he filed this lawsuit in January 2010 because [BTT and Keener] continued making slanderous statements even after the July 31, 2009, cease and desist letter. Testimony from another witness, Ms. Linda Hurst, suggests BTT may have actually increased its assault against [Esfahani and EST]. Ms. Hurst testified that in March or April 2010 she and her husband shopped [at] BTT.... When the Hursts informed their salesman that they intended to shop other dealers, including EST, the salesman responded: You don’t want to go over there. That guy is a terrorist and he supports terrorists. He sends all of his money to terrorists.’ ... This unknown BTT salesman was neither Carp nor Keener....
“Patricia Gibson worked at BTT for about eight months in 2007-2008.... She testified that BTT salespeople regularly referred to EST as ‘Taliban Toyota’ and told customers indicating an interest in buying a vehicle from EST that [Esfahani and EST] were terrorists ‘supporting the Taliban.’ ... The BTT sales team also made these statements in sales meetings. And, if a salesman could not close a deal with a customer, he was instructed to tell the customer that ‘Esfahani was supporting the Taliban and they shouldn’t send their money over there.... ’ ... These types of defamatory statements were ‘a common practice’ among salesmen and sales managers and were made by Keener ‘like on a daily basis.... ’
“Josh Wilson, a veteran BTT salesman (since 2006) testified by deposition that he frequently heard BTT salesmen refer to [Esfahani and EST] as ‘Taliban Toyota’ and that this term was used throughout BTT by Keener — on the *935 sales floor, in the sales meeting area, and at the sales managers’ station in the sales tower. Wilson also heard Keener refer to [Esfahani and EST] as ‘Middle Eastern Shore Toyota’ and ‘terrorists,’ and he testified that Keener used this kind of language to get salesmen to discourage customers from ever even visiting EST. Shortly after [Esfahani and EST] presented Wilson’s testimony at trial, BTT fired Wilson.
“[Esfahani and EST] also adduced testimony from Bob Tyler (BTT’s sole owner) and Verne Hilt (BTT’s general manager) that Keener (or the sales manager on duty at the time), was required to talk to every customer before he or she left the dealership.... Hilt also testified that Keener was responsible for ‘training] the salespeople on what to say when talking to a customer.’ ... And, Bob Tyler admitted BTT’s practice of ‘loading the salesman’s lips,’ i.e., telling the salesmen what to say to customers. ... The clear implication of this evidence is that every customer who visited BTT’s dealership since 2008 until at least March 2010 has heard, either directly from Keener or from a salesman whose ‘lips were loaded’ by Keener, that [Esfahani and EST] support terrorism and are actively involved in promoting attacks against the United States and its citizens.”
In addition, Esfahani and EST offered testimony from an economist who specializes in the automobile industry, Dr. Ernest H. Manuel, Jr., Ph.D., who, by means of a “lost profits analysis,” opined that, as a result of the slanderous comments by the defendants, EST had suffered damage in the form of lost sales totaling approximately $7.1 million. Esfahani testified that, in his estimation, not only was Manuel’s estimate of EST’s losses conservative, but he had also personally been damaged by BTT’s and Keener’s conduct in excess of that amount.
At the conclusion of the four-day trial, the jury found for Esfahani and EST against both BTT and Keener on the remaining slander claims.[2] Specifically, as to his slander per se charge against both BTT and Keener, the jury awarded Esfa-hani $1,250,000 in compensatory damages and $2,000,000 in punitive damages; as to the slander per se and slander per quod claims of EST against both BTT and Keener, the jury awarded EST $1,250,000 in compensatory damages and $3,000,000 in punitive damages. The trial court entered judgment accordingly.
BTT and Keener filed various post-judgment motions seeking relief from or an amendment of the trial court’s judgment or a new trial and/or a remittitur of the jury’s damages awards. After the time for ruling on those motions was extended by agreement of the parties, see Rule 59.1, Ala. R. Civ. P., the trial court, following a hearing, entered a lengthy order denying the motions in full. Both BTT and Keener appeal.[3]

Discussion

On appeal, BTT and Keener contend that the trial court erred in failing to grant *936 them a new trial based on certain alleged evidentiary errors they maintain resulted in the jury’s allegedly erroneous award of excessive damages. Alternatively, BTT and Keener maintain that they are entitled, under the guideposts set out in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors articulated in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), to a remittitur of both the jury’s compensatory-damages and punitive-damages awards to Esfahani and EST.

I. Evidentiary Rulings

Standard of Review

“ ‘ “ ‘The standard applicable to a review of a trial court’s rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.’” Mock v. Allen, 783 So.2d 828, 835 (Ala.2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998))....
“ ‘ “ ‘The second principle “is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’”” Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992)). See also Ala. R.App. P. 45. “The burden of establishing that an erroneous ruling was prejudicial is on the appellant.” Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991).’
“Middleton v. Lightfoot, 885 So.2d 111, 113-14 (Ala.2003) (emphasis omitted).”
Wood v. Hayes, 104 So.3d 863, 870 (Ala.2012).

A. Exclusion of Evidence Regarding Previous Federal Litigation

Keener initially contends that the trial court erred in excluding evidence concerning the prior “cybersquatting” litigation initiated by BTT against Esfahani and EST in federal court. The trial court concluded that “the excluded evidence, if admitted, would have likely resulted in undue delay and waste of time on this case” and that it was, thus, “properly excluded under Rules 402 and 403, [Ala. R. Evid.].”
Keener argues that the exclusion of the referenced evidence “[kept] the jury from hearing about [EST and Esfahani’s] alleged improper advertising techniques.” (Keener’s brief, at 42.) In support of his assertion that the exclusion of the evidence amounted to error, Keener points to Rules 401 and 402, Ala. R. Evid., which generally allow for the admission of “[a]ll relevant evidence” unless otherwise excluded. Rule 401, Ala. R. Evid. Keener maintains that “evidence of the issues raised in the cybersquatting lawsuit was clearly relevant” as a possible “motivation for [EST and Esfahani’s] filing of the instant litigation” and that “[e]vidence of [EST and Esfahani’s] reputation was certainly relevant and material” as a defense to their slander claims. (Keener’s brief, at 42, 43.) He further argues that the evidence would have aided jurors in understanding the competitive nature of the automobile sales industry.
According to EST and Esfahani, this issue was not preserved for review. Specifically, they contend that Keener did not attempt to introduce this evidence at trial. When there is no indication in the record that a trial court’s ruling on a motion in limine was absolute or unconditional, the proponent of the contested evidence *937 must attempt to admit the evidence at trial and obtain a specific adverse ruling in order to preserve the issue for appellate review. Evans v. Fruehauf Corp., 647 So.2d 718, 720 (Ala.1994); Bush v. Alabama Farm Bureau Mut. Cas. Ins. Co., 576 So.2d 175, 177-78 (Ala.1991); and State v. Askew, 455 So.2d 36, 37 (Ala.Civ.App.1984). Although the trial court did grant EST and Esfahani’s pretrial motion in limine seeking to exclude any reference to the prior federal litigation, Keener does not contend that he attempted to admit the contested evidence at trial and received an adverse ruling. Thus, for all that appears, this issue has not been preserved for review.[4]

B. Admission of Alleged Hearsay

Both BTT and Keener contend that the trial court erred in permitting the introduction of inadmissible hearsay testimony. See Rule 801(c), Ala. R. Evid. (“ ‘Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”), and Rule 802, Ala. R. Evid. (“Hearsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.”). More specifically, according to BTT and Keener, the allegedly inadmissible evidence
“consisted of hearsay evidence through ... Esfahani’s testimony that unnamed employees of EST told him that unnamed customers of EST told them that unnamed employees of BTT told these unnamed customers slanderous statements regarding EST and/or ... Esfa-hani. ... It also consisted of testimony from Linda Hurst as to what an employee of EST told her that unnamed customers of BTT had told him.... ”
(BTT’s brief, at 48; Keener’s brief, at 46.) Both BTT and Keener include selected excerpts of testimony they say demonstrate the multiple levels of hearsay inherent in the challenged testimony. Further, BTT and Keener clearly dispute the trial court’s finding
“that the challenged testimony was, by definition, not ‘hearsay’ because it was not offered to prove the truth of the matters asserted within the statements testified to: that [EST and Esfahani] were terrorists, part of a ‘Taliban Toyota’ terrorist organization responsible for funding or otherwise supporting terrorism in the Middle East, including the Taliban and terrorists in Iraq.”
Other than the argument that the identified statements were clearly offered to demonstrate the truth of the matter asserted, i.e., “that an employee of BTT made slanderous statements regarding [EST and Esfahani],” they do not identify any actual authority demonstrating that, in reaching its conclusion quoted above, the trial court erred. (BTT’s brief, at 52; Keener’s brief, at 49.) Instead, in support of this claim, BTT and Keener rely solely on Armstrong v. HRB Royalty, Inc., 392 F.Supp.2d 1302 (S.D.Ala.2005), which, they say, represents “[t]he reported decision that is closest to the facts of this case.” (BTT’s brief, at 53; Keener’s brief, at 50.) There is no discussion of those purportedly comparable facts or application of those facts to the trial court’s conclusion here, nor is there a pinpoint citation to the portion of Armstrong where the district court purportedly rejected the rationale embraced by the trial court in this case.[5] *938 There is also no discussion in BTT’s and Keener’s original briefs as to whether any of the challenged statements were permitted as one of the many noted exceptions to the hearsay rule.
In any event, the challenged testimony was cumulative of testimony given by numerous other witnesses, whose testimony BTT and Keener do not challenge. As the trial court noted in its order denying the defendants’ postjudgment motions:
“[A]ny attempt by Defendants to show that the admission of this evidence affected the result of the trial would fail. At trial, in addition to the testimony of ... Esfahani, [EST and Esfahani] offered the testimony of Pastor and Mrs. Barbara Bonham, Linda Hurst, Josh Barlow, Patricia Gibson and Josh Wilson, each of whom testified to repeated and significant slanderous statements which qualify as slander per se. Accordingly, if the testimony challenged by [BTT and Keener] were considered hearsay, it was merely cumulative of this other testimony proving [BTT and Keener’s] defamatory statements (to which no such error is or can be attributed). Cf., e.g. Thompson v. State, 527 So.2d 777 (Ala.Crim.App.1988) (refusing to overturn Court’s admission of hearsay as such was cumulative of other admissible evidence on the same issue).
“Moreover, Bob Tyler, BTT’s sole owner, admitted these statements were made by BTT employees. His defense was that such statements were not harmful because they were not believable.”
Therefore, BTT and Keener fail to demonstrate either that the trial court exceeded its discretion in admitting the challenged testimony or that the alleged erroneous admission of any of the statements “probably injuriously affected [their] substantial rights.” Wood, supra.

C. Exclusion of Financial Evidence

BTT and Keener next contend that the trial court erred in excluding from evidence at trial Esfahani’s personal tax returns as well as tax returns from a Hyundai dealership also owned by Esfahani and in preventing the questioning of Esfahani regarding personal losses he had sustained in the stock market. According to BTT and Keener, this ruling prevented them from countering Esfahani’s damages claims by demonstrating that “any alleged decline in the sales of EST was the result of a decline [in Esfahani’s personal] financial situation.” (Keener’s brief, at 52.) Relying on Rules 401 and 402, Ala. R. Evid., they argue that all the excluded evidence was “relevant to the issue of whether or not [Esfahani and EST] had sufficient financial resources to effectively operate [EST]” and was, thus, improperly excluded. (BTT’s brief, at 56; Keener’s brief, at 54.)
Esfahani argues — and BTT and Keener fail to dispute — that Esfahani’s personal tax returns were, in fact, ultimately introduced into evidence, because they were included on a disk containing all the information reviewed by the damages expert retained by EST and Esfahani and the disk was admitted into evidence at trial. Therefore, any challenge with respect to the exclusion of those particular documents is without merit.
Finally, this Court is unconvinced that either Esfahani’s personal tax returns *939 and evidence of his personal financial losses or evidence pertaining to the financial status of a separate business entity owned by Esfahani were, as BTT and Keener argue, relevant to the issues below. Specifically, nothing before us suggests that EST was not a properly formed corporate entity, separate from and independent of any other corporate entity owned by Esfa-hani. Additionally, the record reflects that Esfahani made no claim based on any alleged damage to his Hyundai dealership as a result of BTT’s and Keener’s conduct and that his individual claim excluded any recovery for special damages. Thus, there is nothing indicating that the trial court erred in evaluating the relevancy and admissibility of the challenged evidence.

D. Alleged Evidentiary Errors Related to the Testimony of Dr. Ernest Manuel, Jr., PhD.

BTT and Keener raise claims of error with regard to the trial court’s admission of the testimony of Manuel, the damages expert retained by Esfahani and EST: that Manuel was improperly allowed to testify as to opinions based on facts that were inadmissible or that were not in evidence and that Manuel’s testimony was due to be excluded based on the alleged failure of Esfahani and EST to timely supplement Manuel’s initial report. There is no merit to these claims for several reasons.

1. Procedural History Related to these Issues

The record shows that BTT and Keener moved the trial court to exclude Manuel’s testimony on numerous grounds, including the ground that a 62-page supplemental report from Manuel was produced after the discovery deadline established by the trial court’s scheduling order; alternatively, BTT and Keener requested that they be allowed to re-depose Manuel. The trial court denied the motion to exclude but ordered that they be afforded the opportunity to re-depose Manuel.
After this second deposition, BTT and Keener moved the trial court, pursuant to Rule 26, Ala. R. Civ. P., to exclude Manuel’s testimony and reports as a discovery sanction on grounds that EST and Esfaha-ni had failed to properly supplement their expert’s disclosures and had produced Manuel’s supplemental reports “less than one month before the scheduled trial date and after ... the extended discovery deadline.” (BTT’s brief, at p. 4.) This motion was also denied.
At trial, BTT continuously objected to Manuel’s testimony on the ground that Manuel was purportedly basing his opinion on facts and/or information that had not been admitted into evidence; the trial court, citing Rule 703, Ala. R. Evid.,[6] denied BTT’s objection but allowed a continuing exception. BTT also objected to portions of Manuel’s testimony on the ground that the opinion stated by Manuel
“was based on information that Dr. Manuel got from somebody else’s opinion about what may happen in the future. That opinion testimony is not from an expert qualified in this court....”
The trial court similarly denied that objection by BTT based on its conclusion that Rule 703 permitted an expert to testify as to all “information perceived by or made available to [him]” and noted that “if [BTT had] a problem with the information [Manuel] perceived or that’s been made available to him, [BTT] would be permitted to attack that on cross[-examination].” *940 Thereafter, as mentioned in Part I.C., supra, a disk purportedly containing the entirety of the information relied on by Manuel was entered into evidence by agreement of the parties.

2. Arguments on Appeal

On appeal, BTT and Keener contend that certain facts relied upon, by Manuel were not in evidence or were not admissible and that the trial court thus erred in permitting his testimony. In support of this claim of error, BTT and Keener rely on authority stating that Rule 703 did not alter the rule requiring that the information upon which the expert relies must be in evidence. See, e.g., Ex parte Deardorff, 6 So.3d 1235, 1242 (Ala.2008) (“It is clear that under Alabama law the State must introduce into evidence the information upon which an exp.ert relies.” (citation omitted)); Ex parte Wesley, 575 So.2d 127, 129 (Ala.1990). Specifically, the Advisory Committee Notes to Rule 703, citing C. Gamble, McElroy’s Alabama Evidence § 127.01(5) (4th ed.1991), state: “Rule 703 leaves unaffected the preexisting Alabama law requiring that the facts or data relied upon by the expert, and gotten by the expert other than by firsthand knowledge, generally must be admitted into evidence.” However, that same note explains that facts about which an expert testifies and that may be made known to him or her outside the hearing “include!] data presented to the expert by means other than personal perception, such as through the opinions, records, or reports of others.” Id. The note further explains that “the Alabama case law generally precluding an opinion based upon the unadmitted records or reports of others does recognize exceptions.” Id. (emphasis added).
BTT and Keener point to data purportedly relied upon by Manuel, including pri- or studies of how dealers react to new dealers in the market, data supporting a damages model, “registration data,” projections as to automobile industry growth, “discount rates,” and “etc.,” as not having been admitted into evidence.. There is no discussion in BTT’s and Keener’s briefs as to whether the disk entered in evidence containing “all” of Manuel’s data, as mentioned in Part I.C., supra, contained this data. Further, there is no discussion as to whether Manuel’s testimony fell within one of the recognized exceptions in Rule 703 and mentioned above. Finally, and most importantly, there is no discussion of how the failure to admit this allegedly missing data prejudiced BTT and Keener. Rule 45, Ala. R.App. P. (“No judgment may be reversed ... on the ground of ... the improper admission or rejection of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”). Instead, we have a list of data, an assertion that the data was not in evidence, and a conclusion that reversible error therefore occurred. This is not sufficient to convince this Court that the trial court exceeded its discretion in allowing Manuel’s testimony.
BTT and Keener separately point to “the Auto Pacific Projections” as data relied on by Manuel, which, they argue, was neither “properly admitted” into evidence nor admissible. (BTT’s brief, at 58; Keener’s brief, at 56.) They cite Rules 701 and 702, Ala. R. Evid., as support for their contention that the evidence represented opinion testimony from other than a qualified expert.
BTT’s and Keener’s briefs assert, but do not demonstrate, that the “Auto Pacific Projections” were opinions and were not competent data upon which Manuel, could rely as a basis for his testimony. There is no discussion as to how the projections *941 Manuel purportedly relied upon were faulty, incomplete, or unreliable. No authority is cited demonstrating that such evidence is inadmissible. BTT and Keener also fail to counter Esfahani and EST’s contention that the evidence was merely cumulative of other data reviewed and discussed by Manuel. See Leiser v. Raymond R. Fletcher, M.D., P.C., 978 So.2d 700, 705 (Ala.2007) (holding that erroneous admission of merely cumulative evidence is harmless). Nothing demonstrates that the trial court exceeded its discretion on this issue.
Finally, BTT and Keener argue that the trial court erred in failing to exclude Manuel’s testimony and reports as a discovery sanction. This Court has repeatedly recognized that a trial court has broad and considerable discretion in controlling the discovery process. See, e.g., Ex parte Vulcan Materials Co., 992 So.2d 1252, 1259 (Ala.2008). The authorities cited by BTT and Keener emphasize the “absolute duty” imposed upon parties by Rule 26(e), Ala. R. Civ. P. (and by the scheduling order entered by the trial court in this case), to properly and timely supplement discovery when appropriate. As BTT and Keener also acknowledge in their briefs to this Court, however, that rule provides no explicit sanction should a party fail to supplement, and the Committee Comments to that rule suggest both that sanctions for violating the rule will typically be imposed only “sparingly” and in “limited instances” and that the options, at the trial court’s discretion, in such cases include “ ‘exclusion of evidence, continuance, or other action, as the Court may deem appropriate.’ ” (BTT’s brief, at 63; Keener’s brief, at 67) (quoting Committee Comments on 1978 Adoption of Rule 26, Ala. R. Civ. P. (emphasis added)).
BTT and Keener cite nothing showing that the trial court’s actions here, which denied the requested exclusion but alternatively permitted BTT and Keener the opportunity to re-depose Manuel on the allegedly untimely supplementation, exceeded the latitude afforded it. Moreover, although they cite federal caselaw establishing a four-factor test to be applied in evaluating the propriety of sanctions pursuant to Rule 26, there is no discussion or argument actually applying those factors to the circumstances presented here. Instead, they reference — solely by means of citation to other authorities — only the time when they initially learned of the withheld information and the alleged willfulness behind the purported failure to timely supplement.
The trial court resolved this particular claim in its order denying the post-judgment motions of BTT and Keener as follows:
“The Court rejected each of [BTT and Keener’s] arguments [challenging the admission of testimony from Manuel] prior to or during the trial. The Defendants have offered nothing new to their previously rejected arguments. The Defendants retained an expert but declined to call him to challenge Dr. Manuel’s methodology or damage calculations. Moreover, [BTT and Keener] elected not to request a special verdict form which would have required the jury to assess damages separately for slander per se (for which damages are presumed) and slander per quod (for which the Plaintiff must show special, monetary damages). Consequently, the jury rendered a general verdict in favor of [EST] on claims of slander per se and slander per quod. The Court cannot now speculate on how the jury apportioned [its] verdict, if at all, and [BTT and Keener] could not show, if they tried, that the admission of Dr. Manuel's opinion affected the damages assessed for slander per quod. Regardless, the Court expressly finds that [Esfahani and EST] presented more *942 than sufficient testimony and evidence to support the jury’s verdict even if all compensatory damages could be apportioned to the slander per quod claims.”
(Emphasis added.) BTT and Keener do not address the trial court’s findings, as set out above, or counter its conclusion that, given the general nature of the jury’s verdict, they cannot demonstrate the prejudice necessary to support a finding of reversible error, even assuming that Manuel’s testimony and reports were improperly admitted. They are, therefore, due no relief on this claim.

II. Excessiveness of Damages Awards

A. Compensator Damages

Although BTT and Keener maintain that this case presents an issue of first impression for this Court, namely “the amount of proof necessary for an award of substantial damages in a slander action,” the standard for reviewing a jury’s damages award in an action involving claims of slander per se is well established. (BTT’s brief, at I; Keener’s brief, at 1.) As both BTT and Keener acknowledge, this Court has previously explained:
“ ‘[DJamage is implied by law when spoken words are found to be slander per se.’ Anderton v. Gentry, 577 So.2d 1261, 1263 (Ala.1991), see also Sunshine Invs., Inc. v. Brooks, 642 So.2d 408, 410 (Ala.1994). Words found to be slander per se ‘relieve the plaintiff of the requirement of proving “actual harm to reputation or any other damage ” in order to recover nominal or compensatory damages.’ Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1092 (Ala.1988), quoting W. Prosser and W. Keeton, The Law of Torts § 112, at 788 (5th ed. 1984).”
Liberty Nat’l Life Ins. Co. v. Daugherty, 840 So.2d 152, 157 (Ala.2002) (emphasis added).

1. Esfahani

BTT and Keener initially appear to contend that evidence presented by Esfahani, which was aimed at establishing both damage to his reputation and mental anguish suffered by him as a result of the slanderous statements made by BTT and Keener, was insufficient to sustain the jury’s compensatory award. They cite, in support of that claim, cases aimed at establishing the quality of the evidence necessary to establish actual damages. Those cases, however, excepting Daugherty, supra, appear in-apposite in that they do not involve a finding of slander per se and a corresponding award; instead, they concern, generally, the sufficiency of evidence to sustain a jury’s award of mental-anguish damages.[7]
In Daugherty, this Court reiterated the general rule “that when a defamatory statement is slanderous per se, the law infers injury to reputation and the plaintiff is relieved of the requirement of proving actual harm to reputation or any other damage.” 840 So.2d at 160. Nonetheless, we analyzed the defendants’ argument that the jury’s compensatory-damages award *943 was not supported by the evidence. We noted, as does the trial court here, that based upon the applicable presumption, the jury’s award was not assumed to be based solely on the plaintiffs testimony aimed at establishing resulting mental anguish. 840 So.2d at 162. We then recounted the plaintiffs evidence concerning the suffering allegedly experienced and concluded that, even had the entire award been intended as recompense for the plaintiffs mental anguish, the award was “sufficiently grounded” in the evidence to be sustained. 840 So.2d at 163.
Here, the jury cleaidy returned a verdict in favor of both Esfahani and EST and against BTT and Keener on the claim of slander per se. As the trial court noted in its postjudgment order:
“[BTT and Keener’s] arguments for the excessiveness of ... Esfahani’s compensatory damages award centers on two related assumptions that are contrary to the law: (1) the verdict for compensatory damages in favor of ... Esfahani was based entirely, mostly or even partly on the mental anguish he suffered, and (2) ... Esfahani would be required to prove mental anguish damages at all in order to recover compensatory damages.
“Contrary to [BTT and Keener’s] argument, general damages that are presumed to flow from defamation per se include the loss or impairment of reputation and/or standing in the community and mental anguish or suffering. Daugherty, 840 So.2d at 162. The Plaintiff need not prove any mental anguish since it is assumed to flow from the very nature of the defamatory words spoken in a per se case.”
(Emphasis in original.)
In light of the applicable standard discussed in Daugherty, Esfahani need not have presented evidence of either damage to his reputation or mental anguish, because both were presumed. Regardless, as in Daugherty, Esfahani did present evidence establishing the fear and worry — for his safety and the safety of his business and his family — that he had experienced after being repeatedly linked to terrorist activity. See Daugherty, 840 So.2d at 163 (“ ‘Mental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience.’ ”) (quoting Horton Homes, Inc. v. Brooks, 832 So.2d 44, 53 (Ala.2001)). He further explained the political persecution that led him to leave Iran and come to the United States as a teenage refugee and the resulting horror he felt on being accused of both funding terrorism and of being an enemy of the country he loves and is proud to call “home.” According to Esfahani’s own testimony, his fears in this regard were so strong that he considered selling his businesses and moving his family to Spain. Additionally, as touched on previously, Es-fahani, without objection, estimated the value of the damage to his personal reputation as “be[ing] in excess of 7.2 million dollars.”
We need not engage in any discussion of society’s attitude toward and opinion of terrorists and terrorist activity and how allegations of such activity may have impacted Esfahani. As Esfahani and EST note, BTT and Keener fail to identify authority mandating a different result than that reached by the trial court.

2. EST

BTT and Keener similarly challenge the amount of the jury’s compensatory-damages award to EST. More specifically, they argue that “[t]he award of compensatory damages to EST is excessive and based on speculation as to the amount of lost sales.” (BTT’s brief, at 80; Keener’s brief, at 80.) In support of this *944 claim, they allege that EST failed to present evidence of áctual damage to its reputation and that the only evidence of any actual lost sales and profits came from Manuel, whose testimony they maintain was speculative.
As discussed above, Manuel’s testimony was properly admitted into evidence at trial. He indicated that EST had suffered $7.1 million in damage. Such evidence supports the jury’s award of $1,250,000 in compensatory damages on EST’s slander per se and slander per quod claims, which was significantly less than the lost profits to which Manuel actually testified.
As the trial court noted, nothing suggests that the majority of the compensatory-damages award to EST was related to EST’s slander per quod claim. Instead, EST also asserted — and proved — the same slander per se arguments advanced by Es-fahani; therefore, the damage to its reputation, which resulted in a compensatory-damages award in an amount identical to that awarded to Esfahani, was both similarly presumed and, as discussed above, demonstrated by the evidence. See, e.g., Daugherty, 840 So.2d at 157.
Finally, in Super Valu Stores, Inc. v. Peterson, 506 So.2d 817 (Ala.1987), this Court provided the following explanation with regard to a lost-profits analysis:
‘“The rule in Alabama concerning proof of lost profits was set forth in Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881 (1966), by Justice Simpson:
“ . In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit
can be made; absolute certainty is not called for or required.” (Emphasis added [in Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985)].)
“ ‘This general rule is applied in most states, and is referred to as the rule of “reasonable certainty.” The United States Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), stated that this rule precludes only those damages not resulting from the wrong, allowing damages stemming from the wrong but uncertain in amount.’
“Morgan v. South Central Bell [Telephone Co.], [466 So.2d] at 115-16 [(Ala.1985)].”
506 So.2d at 327. “The holding in Morgan is that Alabama jury verdicts awarding lost profits will be affirmed if the plaintiff provides a ‘basis upon which the jury could, with reasonable certainty, calculate the amount of profits which were lost as a result of defendant’s wrongful actions.” Id.
Here, despite engaging in a thorough • and sifting cross-examination aimed at undermining Manuel’s calculations, BTT and Keener fail to demonstrate that the estimations of Manuel, who they conceded was an expert in the field, as to the business EST likely lost as a result of BTT’s and Keener’s slander is unreasonable.

B. Punitive Damages

Finally, BTT and Keener contend that, in the absence of a new trial, they are entitled to a remittitur of the jury’s punitive-damages awards to Esfahani and EST based on alleged excessiveness. BTT and Keener urge this Court that an evaluation of the challenged awards pursuant to the guideposts set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors outlined in Hammond v. City of *945 Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), called for — and that the trial court therefore erred in failing to order — a reduction of the jury’s punitive-damages awards.
As recently reiterated by the Court of Civil Appeals in Tanner v. Ebbole, 88 So.3d 856 (Ala.Civ.App.2011), the requisite analysis includes consideration of the following factors:
“The Gore guideposts are: ‘(1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.’ State Farm [Mut. Auto. Ins. Co. v. Campbell], 538 U.S. [408] at 418 [(2003)] (citing Gore, 517 U.S. at 575). The Hammond-Green Oil factors are:
“ ‘ “(1) the reprehensibility of [the defendant’s] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant’s] conduct; (3) [the defendant’s] profit from [his] misconduct; (4) [the defendant’s] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct.” ’
“Ross v. Rosen-Rager, 67 So.3d 29, 41-42 (Ala.2010) (quoting Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala.2003) (paraphrasing the Hammond-Green Oil factors)).”
88 So.3d at 870-71.
In connection with BTT’s and Keener’s postjudgment motions, the trial court heard and evaluated the evidence presented by BTT and Keener, which was aimed at establishing each of the Gore guideposts and the Hammond-Green Oil factors. As reflected in its postjudgment order, following a lengthy analysis, the trial court ultimately concluded that “each factor under Hammond, Green Oil, Gore, and State Farm [Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003)] (to the extent it applies in this case), weighs against a finding of excessiveness and supports the propriety of the Jury’s punitive damages assessment.” The trial court further explained its decision declining to reduce the punitive-damages awards:
“The Court finds that [BTT’s and Keener’s] slanderous attacks on [Esfa-hani’s and EST’s] reputations are deserving of Alabama law’s ‘ “most severe condemnation, its highest blameworthiness and its most deserving culpability,” ’ [Tanner v.] Ebbole, [88 So.3d 856, 873 (Ala.Civ.App.2011) (quoting with approval, Lawnwood Med. Ctr., Inc. v. Sadow, 43 So.3d 710, 731 (Fla.Dist.Ct.App.2010)) ]. ‘The record, when viewed as a whole, ‘makes it probable that the jury’s verdict was motivated by a legitimate concern for punishing and deterring’ the Defendants, rather than by bias, passion or prejudice.’ TXO [Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443,] at 468-69 [(1993)]. The Court deems the amount of the punitive damages awards to be appropriate and reasonable based on the culpability and reprehensibility of [BTT’s and Keener’s] conduct, and to serve the dual purposes of (a) making clear that [BTT’s and Keener’s] conduct was especially reprehensible, and (b) discouraging or deterring [BTT and Keener] and others from conducting themselves similarly in the future.”
*946 BTT and Keener correctly note that this Court “reviewfs] the trial court’s award of punitive damages de novo, with no presumption of correctness.” Mack Trucks, Inc. v. Witherspoon, 867 So.2d 307, 309 (Ala.2003) (citing Acceptance Ins. Co. v. Brown, 832 So.2d 1, 24 (Ala.2001)). See also § 6-11-23, Ala.Code 1975 (“No presumption of correctness shall apply as to the amount of punitive damages awarded by the trier of the fact.”). The trial court’s application of the Gore guideposts and the Hammond and Green Oil factors is also reviewed de novo. See Akins Funeral Home, Inc. v. Miller, 878 So.2d 267, 271 (Ala.2003).[8]

1. Economic Impact

First; BTT and Keener contend that EST and Esfahani demonstrated little to no economic impact as a result of the slanderous statements. BTT and Keener rely, in making this statement, on the supposition that Manuel’s testimony that EST likely lost approximately $7,000,000 in sales was entirely speculative. The record clearly refutes this claim.
Although, as BTT and Keener argue, and, as mentioned previously, the jury obviously discounted the figures quoted by Manuel, there was, nonetheless, evidence of a negative economic impact on EST’s sales. BTT and Keener, therefore, do not demonstrate that this factor supports the requested remittitur.

2. Amount of Compensatory Damages/D.isparity

BTT and Keener next argue that the 2:1 ratio of punitive damages to compensatory damages in this case also requires remittitur. Although BTT and Keener inexplicably note that “Alabama courts have previously held that punitive damages awards that exceed ten times the amount of a compensatory damage award are subject to higher scrutiny,” those cases are clearly inapplicable here. (BTT’s brief, at 84; Keener’s brief, at 89.) Further, although they appear to contend that the award here should also be subjected to heightened scrutiny “because the compensatory award itself contains an element of punitive damages,1” they fail to cite any authority supporting their claim. (BTT’s brief, at 84-85; Keener’s brief, at 89.) They similarly fail to cite any case involving similar facts or comparable conduct that would, illustrate that the jury’s award is disproportionate; in fact, neither BTT nor Keener appears to pursue a disparity argument despite including that phrase in the applicable subheading for this issue.
With regard to this particular guidepost, the United States Supreme Court has
“noted that the ‘most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff,’ and ... ‘[t]he principle that exemplary damages must bear a “reasonable relationship” to compensatory damages.’ BMW, 517 U.S. at 580, 116 S.Ct. at 1601. The Supreme Court rejected the notion that a purely mathematical formula could mark the constitutional line:
“‘Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.... Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in *947 cases in which the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine.... In most cases, the ratio will be within a constitutionally accepted range, and remittitur will not be justified on this basis.’
“517 U.S. at 582-83, 116 S.Ct. at 1602-03. (Citations and emphasis omitted.)”
Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524, 529 (Ala.1997).
Here, the punitive damages are exactly twice the jury’s compensatory-damages award and are actually less than the actual compensatory damages claimed by EST and Esfahani. BTT and Keener cite no authority demonstrating that, in light of the present facts, the punitive-damages award is disproportionate and constitutionally infirm. Further, as the Court of Civil Appeals has previously observed, we have upheld substantial punitive-damages awards when the evidence demonstrates a pattern and practice of such behavior by the defendant. See Mercy Med. v. Gray, 864 So.2d 354, 365 (Ala.Civ.App.2002) (and cases cited therein). We therefore find that the ratio of compensatory damages to punitive damages, given the facts, is reasonable.

3. Guilt for the Same or Similar Incidents

BTT and Keener also argue that they are entitled to a remittitur because, they say, nothing suggests that they were guilty of the same or similar conduct in the past.
Contrary to this argument, and as the trial court noted, “[t]he evidence indicates that the defamatory conduct here was not a case of a few isolated incidents of a rogue salesman or of salesmen making false statements about a competitor in passing.” Instead, Esfahani and EST “offered testimony from former and present BTT employees that BTT’s slanderous statements were part of BTT’s company policy for competing against EST” and “that these sales practices were still being used even after this lawsuit was filed.” Therefore, the record clearly contains evidence indicating “similar incidents.”[9] See Johnson, 701 So.2d at 529 (“[R]epeated misconduct is more reprehensible than an individual instance of malfeasance.”).
Although BTT and Keener cite Johnson, they fail to actually explain how our remit-titur of the punitive-damages award in Johnson mandates a similar result here. In Johnson, this Court ultimately remitted the jury’s punitive-damages award upon reconsideration and review of the case as directed by the United States Supreme Court in light of its opinion in Gore. 701 So.2d at 534. BTT and Keener, however, fail to acknowledge the multiple considerations influencing that decision. Instead, they simply argue that because the facts demonstrated repetitive instances of the tortious behavior in Johnson and the defendants, there, obtained a remittitur, BTT and Keener must be entitled to the same. That is not the law, and this factor also does not weigh in favor of remittitur.

*948
b. Attempts to Remedy the Wrong

BTT and Keener next contend that because they received only one — allegedly limited — complaint referencing the slanderous statements before Esfahani and EST initiated the underlying litigation and because BTT purportedly immediately questioned the employee referenced in that complaint, they “took ... appropriate steps to remedy the alleged wrong.” (BTT’s brief, at p. 87.)
The trial court rejected this claim as follows:
“Following the jury’s verdict, BTT has taken no corrective action to protect [Esfahani and EST] from similar conduct in the future. Instead, BTT continues to focus on non-harassment and discrimination and hostile work environment and typical internal employee law issues and training. Most significantly with respect to this punitive damages factor, BTT still has no written policy against making defamatory statements about a competitor.
“ ‘Q. Have you done anything specifically because of the verdict?
“ ‘[Tyler]: I don’t think.
‘“Q. You can’t think of anything sitting here today, that you would have changed in how you addressed this entire issue?
“ ‘[Tyler]: I don’t think.’
“[BTT’s and Keener’s] abject failure to take corrective action or attempt to remedy the wrong through retraction (which was demanded in the cease-and-desist letter) or through taking any corrective actions even after a significant verdict shows a failure to acknowledge their wrongs and a propensity toward recidivism. Cf., [Tanner v.] Ebbole, [88 So.3d 856, 871 (Ala.Civ.App.2011)] (finding the failure to issue any retraction after getting a cease and desist letter relevant to reprehensibility).”
Although the trial court rejected application of this particular factor in favor of a remittitur on the basis of BTT’s and Keener’s posijudgment failures, a review of their pretrial conduct produces a similar result. As Tyler testified, some type of minimal internal investigation aimed primarily at Carp, the employee named by Esfahani and BTT in the July 2009 cease- and-desist letter, who was under the direct supervision of Keener, did occur. Further, BTT employees were allegedly instructed that such slanderous statements were prohibited. However, the evidence suggests that the slanderous statements continued after those initial efforts without further investigation by or repercussion from BTT. Further, Tyler’s testimony reflected that, sometime before trial, it became apparent to him that the slanderous statements had, in fact, occurred as Esfahani and EST had alleged. Despite that knowledge, neither Keener nor BTT issued a retraction. Thus, this factor also does not weigh in favor of a reduction of the jury’s punitive-damages award.

5. Opportunity to Remedy the Wrong

BTT and Keener maintain that the July 2009 cease-and-desist letter represented the only opportunity presented to them to remedy the wrong of which they were accused but that it contained insufficient information to allow them to do so. The evidence recounted above, however, indicates that this conduct was an ongoing practice of BTT and its agents. BTT received and Keener learned of the cease- and-desist letter in July 2009; Esfahani and EST filed the underlying litigation approximately six months later in January 2010. Within that time frame, and even after the filing date, as set out above, despite BTT’s learning that the allegations made by Esfahani and EST apparently were true, the slanderous statements continued.

*949
6. Degree of Reprehensibility

BTT and Keener acknowledge, as the trial court also observed, that this particular factor, namely the degree of reprehensibility of their conduct, is the single most important factor in the remittitur analysis. See Gore, 517 U.S. at 575. BTT and Keener attempt to lessen the reprehensibility of their self-claimed “moderately” reprehensible conduct by comparing it to the tortious conduct of defendants in other cases, by noting the lack of any resulting physical harm, and by arguing that Esfahani and EST are not members of a class typically regarded as financially vulnerable.
As demonstrated by its postjudgment order, the trial court clearly disagreed. Specifically, it applied the following criteria and considerations established in the State Farm and Green Oil cases, supra, for gauging the degree of reprehensibility:
“(A) The type of harm caused (physical as opposed to economic)....;
“(B) The degree of the Defendants’ awareness of any hazard his conduct caused or was likely to cause, or whether Defendants’ conduct showed an indifference to or reckless disregard of the health or safety of others....;
“(C) Whether the Plaintiff had financial vulnerability....;
“(D) Whether the conduct involved repeated actions or was an isolated incident; and, the existence and frequency of similar past con-duct_;
“(E) The duration of the conduct....; and
“(F) Whether the harm resulted from intentional malice, trickery, or deceit or was a mere accident; and any concealment or ‘cover up’ of the hazard or acts of the Defendant. ...”
The trial court conducted a lengthy analysis of each of the foregoing factors; we include only a brief sampling of its conclusions as to each:
(A) Type of harm: “Compounding this special difficulty of proving actual damages, and likely a primary reason for the personal reputation’s ‘unusually high protection,’ is the fact that damage to reputation, once done can never be completely undone. In Ledbetter, the Middle District of Alabama declared that ‘one’s good reputation is hard to obtain and even harder to regain (if it can be) once damaged.... By [slandering Ledbetter’s name and reputation], United sowed seeds of doubt in the community about Ledbetter’s reputation that can never be uprooted.’ Ledbetter v. United Ins. Co. of America, 845 F.Supp. 844, 849 (M.D.Ala.1994) (emphasis added). See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 344, n. 9 (1974) (‘an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie ....’) (emphasis added); [Lawnwood Med. Ctr., Inc. v.] Sadow, 43 So.3d [710] at 731-32 [(Fla.Dist.Ct.App.2010)] (jury ‘could rationally have equated the slanders to feathers loosed in the wind, with no one ever knowing where they all landed or whom they touched. The effects could be seen as insidious and unknowable’) (emphasis added).”
(B) Degree of defendants’ awareness: “The Ebbole court found that, being engaged in the same business as Plaintiff, the Defendants ‘were well aware of the hazard their conduct *950 was likely to cause.... ’ Here, the evidence shows that [BTT and Keener] repeatedly defamed [Esfa-hani and EST], [BTT’s] nearest Toyota competitor, by smearing them in a manner that can only be viewed as purposely intended to create a hazard. The Court cannot fathom a worse trifecta of crimes of which to accuse a businessman and his business than treason and funding terrorism and the murder of American soldiers, particularly considering Esfahani’s national origin, the demographic makeup of the vehicle market here and the wars in the Middle East.”
(C) Plaintiffs’ financial vulnerability: “While this factor is not applicable, the Court notes that the Plaintiffs raise a good point that perhaps an appellate court can review in the future as supporting reprehensibility under an analysis which considers more than just financial interests .... Defamation per se presents a particular vulnerability, not raised in cases like Gore and State Farm: the vulnerability of one’s reputation to certain targeted defamatory accusations. Here, the reputation of a business owned by an American businessman originally from Iran is especially vulnerable to a competitor’s defamatory accusations of terrorism and funding terrorism in the Middle East. That is, ... Esfahani’s Iranian origin was used by [BTT and Keener] to give an ‘air of credibility’ to such slanderous statements.”
(D) Isolated incident or repeated actions: “The evidence indicates that the defamatory conduct here was not a case of a few isolated incidents of a rogue salesman or of salesmen making false statements about a competitor in passing.... [Esfahani and EST] ... offered testimony from former and present BTT employees that BTT’s slanderous statements were part of BTT’s company policy for competing against EST.”
(E) Duration of conduct: “[T]he Defendants’ reprehensible conduct insofar as the defamation per se continued from at the latest early 2008 until at the earliest March 2010, or at the least two years. This is a significant length of time for an all-out attack on the reputation of [Esfaha-ni and EST].”
(F) Intentional conduct or accident: “The Court notes ... that the factor of a concealment or cover-up of [BTT’s and Keener’s] actions causing harm to [Esfahani and EST] is supported by the ... moving targets presented by the testimonies of Keener and ... Tyler, as well as the convenient memory lapses, evasions, contradictions and inconsistencies running through their testimonies in their pre-trial, trial and post-trial testimonies.... [A]n abundance of evidence exists to establish the significant extent of the [BTT’s and Keener’s] animosity and resentment toward [Esfahani and EST].”
Although BTT and Keener maintain that the testimony establishing their slanderous statements, as reported by EST and Esfa-hani’s witnesses, were isolated incidents, the evidence suggested otherwise. Further, though EST and Esfahani were able to identify merely a handful of BTT customers who personally heard the remarks, there are potential untold numbers of others about whom Esfahani and EST never learned. See Ebbole, 88 So.3d at 872 (explaining that Alabama’s presumption of damage in cases of per se defamation stems from the fact that “ ‘[i]t would fre *951 quently be difficult to prove any pecuniary injury from slander, and always impossible to establish its full extent.’ ” (quoting Johnson v. Robertson, 8 Port. 486, 489 (Ala.1839))). Further, as the trial court emphasized, the nature of these particular remarks render them reprehensible — especially in today’s political climate. Therefore, this factor, too, weighs against a reduction of the jury’s punitive-damages award.

7. BTT’s and Keener’s Profit

BTT and Keener note that a punitive-damages award should be aimed at removing any profits the defendants gained from their tortious conduct. See Ross v. Rosen-Rager, 67 So.Sd 29, 44 (Ala.2010) (“ ‘ “[I]f the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.” ’ ”) (quoting Green Oil, 539 So.2d at 223, quoting in turn Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)). Both BTT and Keener argue that this factor requires a reduction of the punitive-damages award because, they say, there is no evidence suggesting that they actually profited from the slanderous statements aimed at Esfa-hani and EST.
Contrary to their arguments, the trial court concluded that this factor, too, weighs against remittitur:
“From the Defendants’ actions, it can be inferred under Alabama law that they intended to profit from their misconduct. In Ledbetter v. United Ins. Co. of Am., 845 F.Supp. 844, 849 (M.D.Ala.1994), the Defendants made slanderous remarks about Ledbetter, a former United sales representative, to Ledbetter’s former customers in an effort to discourage those customers from doing business with Ledbetter. The court held that under the circumstances ‘it can be inferred that United profited from its action.’ Id. 845 F.Supp. at 849 (emphasis added).”
BTT and Keener do not produce any authority demonstrating that the trial court erred with regard to the foregoing finding. Although it might have been difficult for Esfahani and EST to demonstrate the precise profits BTT and/or Keener gained, their intent to profit from their actions is indisputable.

8. BTT’s and Keener’s Financial Postures

Neither BTT nor Keener advances any argument that the potential impact of the jury’s punitive-damages award on their respective financial postures justifies remitti-tur.

9. Criminal Sanctions

BTT and Keener appear to believe that a remittitur is due because, they contend, the punitive damages awarded far exceed the criminal sanctions they could have faced if prosecuted for the same conduct at which the punitive-damages award is aimed — which they indisputably have not been. See Gore, 517 U.S. at 583. They rely, however, solely on a statute this Court has previously declared unconstitutional as support for the extent of the criminal sanctions they say could be legally imposed. Regardless, as noted previously, “[t]here is no evidence indicating that [either BTT or Keener] has been subject to any criminal sanctions for similar conduct; therefore, this factor does not require a remittitur.” Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 319 (Ala.2003) (citing Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala.1999)).

10. Other Civil Actioiis

Finally, Keener maintains that because he has not been sued in the past for *952 similar conduct, the lack of any comparable civil actions against him supports his request for a remittitur. Keener misunderstands this factor. As with the previous factor, it is precisely because “[t]here is no evidence indicating that [Keener] has been subject to any other civil actions based on similar conduct ... [that] this factor does not require a remittitur.” Id.
In consideration of the foregoing, BTT’s and Keener’s contentions that at least eight of the applicable factors demonstrate the excessiveness claimed and mandate a reduction of the jury’s punitive-damages awards are without merit. Instead, it appears that only a single factor, namely the absence of any particular financial vulnerability of the targets, supports BTT and Keener’s request. Therefore, the requisite analysis overwhelmingly supports an affir-mance of the . jury’s punitive-damages awards. The trial court correctly denied BTT and Keener’s request for a new trial and appropriately refused to remit the jury’s punitive-damages awards.

Conclusion

In consideration of the foregoing, the judgment of the trial court is affirmed.
1110840 — AFFIRMED.
1110857 — AFFIRMED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, MAIN, WISE, and BRYAN, JJ., concur.

. Carp's employment was terminated by BTT before the underlying complaint was filed.

. At the close of Esfahani and EST's case, upon BTT’s renewal of, among other motions, its motion seeking a "summary judgment" as to the intentional-interference-with-business-relations claim included in the complaint, Es-fahani and EST voluntarily withdrew that count. Further, at the close of all the evidence, Esfahani and EST dismissed the slander per quod claim as to Esfahani, individually, with regard to both BTT and Keener. Thus, the claims presented for the jury’s consideration included the slander per se claims of both Esfahani and EST and the slander per quod claim of EST.

. Although BTT and Keener filed separate notices of appeal and separate briefs to this Court, the content of their respective briefs appears, for the most part, virtually indistinguishable.

. We further question whether the challenged evidence was, as Keener maintains, relevant. Specifically, we note that EST and Esfahani were apparently successful in the federal action.

. Armstrong arose in the context of a franchise dispute and hinged upon resolution of a motion in limine seeking to exclude the admission of the terms of a settlement offer *938 extended by one party to the other in prior litigation between the parties. The district court considered Rule 408, Fed.R.Evid. (concerning an offer to compromise), Rule 402, Fed.R.Evid. (irrelevant evidence is inadmissible), and Rule 403, Fed.R.Evid. (relevant evidence may be excluded if its probative value is outweighed by its potential prejudice). As EST and Esfahani observe, neither slander nor hearsay figure in Armstrong.

. Rule 703, Ala. R. Evid., provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.”

. See, e.g., Slack v. Stream, 988 So.2d 516, 532-33 (Ala.2008) (declining to remit mental-anguish-damages award on plaintiff's claims of defamation, invasion of privacy, and intentional interference with a business contract); Kmart Corp. v. Kyles, 723 So.2d 572, 579 (Ala.1998) (concluding that jury's $100,000 compensatory-damages award on plaintiff’s claim of malicious prosecution was not supported by the evidence); Sperau v. Ford Motor Co., 674 So.2d 24, 41-42 (Ala.1995) (affirming trial court's remittitur of damages for mental anguish in consideration of evidence adduced at trial of plaintiff’s fraud-based claims); and Warren v. Birmingham Bd. of Educ., 739 So.2d 1125, 1132-33 (Ala.Civ.App.1999) (affirming the trial court’s summary judgment as to the plaintiff’s claims of libel and slander based upon plaintiff's failure to produce substantial evidence of actual malice of defendants, who were public officials, in making the subject statements).

. For the sake of simplicity, we have reviewed the factors as they are identified by BTT and Keener in their briefs and have considered each in the order presented in those briefs.

. Although Keener testified below and argues again on appeal that the slanderous statements attributed to him represented a single, isolated incident, testimony from other witnesses suggested otherwise. Indeed, as the trial court observed, ''[t]he testimony of ... Tyler and ... Keener in this litigation was overwhelmingly 'fraught with contradictions, inconsistencies, evasions, convenient memory lapses, efforts to blame others and lies.’ " It is well established that any credibility determination was solely the province of the jury. See, e.g., Tucker v. State, 650 So.2d 534, 535 (Ala.Crim.App.1994) ("'The weight and probative value to be given to the evidence, the credibility of the witnesses and the resolution of conflicting testimony are for the jury's determination.’ " (quoting Brown v. State, 588 So.2d 551, 559 (Ala.Crim.App.1991))).